We have four cases before the court this morning. The first, Asrari v. DHS, is case number 171064. I apologize, we have four argued cases, five cases total on the docket this morning. May it please the court, Rachel Elsby for the petitioner, Vahid Asrari. The board's decision should be reversed because it rests on multiple legal errors and is not supported by substantial evidence. Specifically, the board committed legal error by not fully Similarly, the board committed legal error in its application of the law to the same analysis of CAR Factor 1, and because of these legal errors, its decision cannot be supported by substantial evidence. Do you dispute that the performance review itself automatically triggered the performance plan? We do, and we don't think that that's what the administrative judge found, and we don't think that that's what the record supports. The record certainly supports that the mid-year review, he was deficient in two categories in the mid-year review, and the handbook states that if you're deficient in even one category, you could be subject to a performance plan, but the administrative judge found in his decision that he would be potentially subject to that performance plan in his end-year evaluation. So it wasn't that he was going to be put on it automatically or that there's any sort of evidence that says this is triggering a performance evaluation or performance plan. Even though he wasn't just deficient, he was at a one, which is completely unacceptable. That's right, and so you would expect that they would take that action, but the evidence in the administrative judge's finding actually indicates that that would have come later in time, perhaps at an end-of-year evaluation. I don't dispute that under what it says in the TSA handbook that you would have expected this to happen, but that's kind of the problem in this case, that it actually gets to the second legal error committed by the administrative judge and the board, that the question under the Whistleblower Protection Act is not whether the agency could take certain action against an employee, but whether in fact they were going to take the action against the employee, and that precise action, not just any action. And so you have a similar problem with the suspension, whereas his SOP violations, the SOP violations that are identified in March on the 26th and the 28th could be used to suspend an employee, but in fact the evidence doesn't support that that's what the TSA was going to do. And if you look at the subject matter that was the subject of his second protective disclosure, you get a sense that this is a security station where there are certain things going on. Maybe what's in that protective disclosure was not an SOP violation, the administrative judge found that, but it appears, there's an appearance that there isn't kind of a disciplinary enforcement going on at this security station. There's very little evidence as to CAR Factor 3, which would have supported the government there, in fact, as to the suspension or the IPN and the removal. So but is it your position that the first statement was truly a protected whistleblower disclosure? That was found by the board below and it has not been disputed by the government. They haven't contested that at all. It doesn't really say much of anything though, does it? Well, you know, I think it raises questions about what's happening at this particular security station and to the extent it starts to become a squeaky wheel where somebody's going to start looking, are they rotating employees properly? Are employees doing what they're supposed to be doing? Are they talking on the phone or doing other things? And that way maybe it's not kind of your extreme whistleblowing case where you have, you know, a really kind of extreme violation but you still have a situation where he's now drawing attention to how these supervisors are running this particular security station and in that way it is a whistleblowing, an act of whistleblowing. It was found to be one by the board and at that point and the suspension comes May 2nd, days after that act, so it does actually look like that was an act of retaliation. But even in the face of very clear whistleblowing, an agency can still bear its burden of establishing that this individual would have been suspended or discharged anyway, right? That's absolutely right and I think that really goes back to the second legal error made by the administrative judge in the board below. The administrative judge specifically found that the charge is well supported and the suspension penalty was a reasonably measured response to the charge. The problem is what we don't have in the record is he had these three SOP violations in March and so we suspended it because of them. What you really have is he had some SOP violations in March, then you have this mid-year review evaluation. The mid-year review evaluation says nothing about SOP violations and says nothing about any sort of, you know, suspension or disciplinary action that's coming. In fact, what it does say is in the area of risk-based security, it rates Mr. Estrari as a three. What that means is that he shows a knowledge of SOPs and properly applies the SOPs. So you have these events, these SOP violations in March. Well, there's a reason it was a three as opposed to a four or five, right? That's fair, but a three is achieving expectations and is described as properly applying SOPs. Is it your position that a mid-year review has to outline every reason that it's not a perfect number? No, I don't think we would take that extreme of a position, but we would take the position that if there had been disciplinary action... That is argument you're making and you're citing Whitmore for that proposition, right? Well, to the extent that this particular performance review evaluation, what it says, the fact that he got a three in this area and it's saying he's properly applying SOPs and makes no mention of this particular violation that is so five days. It doesn't make any sense and at the very least... Are you saying that he makes no mention of it or that it was completely ignored? Maybe I misunderstood Judge O'Malley's question. The administrative judge, with respect to the suspension, makes no mention of it and should have under Whitmore because it plainly contradicts the conclusion that he reached. And so under Whitmore, at the very least, you need to address and explain how you got past what's said in the countervailing evidence was ignored, just not considered at all. What's similar about that in this case? So we would not go so far as to say that the mid-year review evaluation was ignored because, of course, he briefly mentions it in the context of the IPN. But the fact that you have the content of the mid-year review evaluation contradicting the conclusion he's reaching, we would say that is contradictory, countervailing evidence. It detracts from his conclusion. And so at the very least, under Whitmore, you need to address it. You need to explain it and say how I got from point A to point B, notwithstanding... Well, wasn't there actually evidence in the record that initially, after the first violation in March, the conclusion was, well, I'm going to do some kind of discipline. I'm not going to go so far as to suspend him. But after the second violation, they started going back and looking and realizing it was a lot more than just three violations. So on March 26th, Ms. Ashcraft writes a memo that says, I'm thinking about some sort of disciplinary action. She writes a second memo on March 28th after the third violation. It says she had previously thought about a performance evaluation, but it's silent as to any future disciplinary activity. So we don't really know what's It's done by Mr. Bezaris. It's completed on April 7th. It is very hard to make sense of what the fact-finding says because it is internally contradictory. But notwithstanding that Mr. Bezaris finished that fact-finding on April 7th, on April 11th, you have the mid-year review evaluation. Mr. Bezaris is in it. He's conducting it. So it makes very little sense that if they had the SOP violations and then a fact-finding, and from that, we're going to suspend this man, that then you give him and achieves expectations in his mid-year review evaluation for that. I don't really find anything odd about that. I mean, the mid-year review process would have probably started weeks, if not months, earlier and may already have culminated even before Mr. Bezaris' process was in place or finished. So these aren't necessarily the same tracks. Why are you saying it doesn't make sense that a mid-year evaluation, which was being probably done for the entire staff, I'm sure it was required at least by regulations, if not statutes, and it was probably done on kind of a systematic basis, would have necessarily encompassed an investigation targeted at certain specific misconduct? I mean, I think what you're saying is, well, once they found this out, they should have reconsidered and given him a new mid-year evaluation. But I'm not sure that's how the government works. These evaluations are usually done on a certain cycle. They're required to be done and signed by a certain cycle. So it may have been done and signed and put into place, and he had it given to him or discussed with them. And this investigation was proceeding on a separate track. It doesn't seem to me all that illogical that the mid-year evaluation wouldn't have considered this evidence. I think in the abstract, I would agree with you, Judge Hughes, except for that this particular mid-year review evaluation in April was for the time period up to and including March 31st. So everything that happened in March that was allegedly the cause of his suspension should have been encompassed by that review period. Well, didn't he get a one for purpose on his knowledge of SOPs? He got a one in two other categories, and if I can go to it. One was getting along with co-workers, and I thought the other one was knowledge of SOPs. I believe it's actually communication. So the performance goal one, which is the one that changes in the IPN, that's the one that is specific to the SOPs. Either way, he got the lowest score on two of the core competencies. That's right. How often does that happen at this airport? Do you know how often that happens at this particular airport? There wasn't evidence as to CAR Factor 3 in this case for the IPN or for the removal proceeding. That may suggest that it doesn't happen that often. There's some testimony sort of to that effect, but I don't think we have definitive evidence either way. One is failing, right? One is failing. And don't the agency's regulations require if you're failing that some action be taken? That's correct. Normally, if you have an unacceptable rating, you should immediately be put into a performance review plan. That's not what happened here. In fact, the performance review plan didn't even came two months later after they said that there were additional deficiencies. So it's not that they had this performance evaluation in mid-April and then suddenly, and we're doing the performance review plan and putting them on it. They actually said- Well, they did it two months later though. It happened two months later. Again, I think you're reading into the timing of government events that are perfectly explained by the way the government operates, which is you do these evaluations. A performance improvement plan usually requires- I don't know what the agency- TSA does this. I assume they have to, in certain sentences, an actual written document saying, here, you're deficient in these three areas. Here's what you need to do to meet your goals and improve your performance to an acceptable level. The fact that it might take two months to complete that document isn't surprising to me at all. I mean, why does that gap tell us anything about whether that's retaliatory? Well, for one thing, the protected disclosure comes in the middle of it. So you have the evaluation in mid-April and then you have the protected disclosure April 30th. A couple days later, now he's being suspended. Now, suddenly, they're changing what was in his one case based on events that happened back in March and should have been addressed in the performance evaluation, and now they're doing something different. And so when you have this sequence, this particular sequence of events, it does smack of retaliation and requires- the government's burden below is clear and convincing evidence. It requires something to show that this is what was going to happen absent his whistleblowing. Here, all we have is evidence that this is something that could have happened either way. Okay, you're into your rebuttal. We'll restore your three minutes. May it please the court. Substantial evidence supports the MSPB's decision denying Mr. Esrari's request for corrective action in this individual right of action. The evidence in support of the five-day suspension was strong. It was overwhelming. He committed three SOP violations from March 26th to 28th. It was discovered that he had violations. Given that it's the government's burden, why shouldn't we hold it against the government that they didn't spell out any of this stuff in the April performance review? Your Honor, the April performance review is not inconsistent with the five-day suspension. A performance evaluation and disciplinary process are on separate tracks, as Judge Hughes was asking about. Even if they were on the same track, the disciplinary process was in the beginning stages. The fact-finding had recently been completed. This was Chapter 75 discipline, serious discipline, suspending an employee. This is not something that was moving quickly. During this time, Mr. Esrari was not performing security duties. But why issue something in April that purports to reflect everything up through the end of March and then say, but we're allowed to now go back and dig up some things that happened in March and add to that? Is Your Honor referring to the improvement plan notice in June, where they refer back? Yes. Well, on the mid-year progress review, they were still conducting the investigation and the disciplinary process. So you wouldn't expect to find that misconduct noted in a mid-year review. And I'll note, Your Honor, that the mid-year review, the ones were for critical thinking, core competency one is critical thinking, and core competency five, teamwork. And under critical thinking, it was recommended that Mr. Esrari go and review SOPs. So although it didn't spell out that he engaged in misconduct, it did note that he was failing with the critical thinking and he needed to review SOPs. As for the improvement plan, it did increase the number of unsatisfactory areas. It included oral communication, and it also included a performance goal for space security. And Ms. Whitehead, a transportation security manager, testified without dispute, and it was credited by the administrative judge, that additional deficiencies were uncovered as the improvement plan notice was being generated. And Judge Rainey, you asked- But the improvement plan notice is being generated after the first disclosure. No, Your Honor, the improvement plan, whether a pin was put to paper after the first disclosure, I don't think the record speaks to that. But there is ample testimony from witnesses saying to the effect that the improvement plan was being discussed. And it's not something that frequently is put together. So you heard from Ms. Ashcroft, excuse me, the administrative judge heard from Ms. Ashcroft testifying to the fact that she began discussing the improvement plan with HR in late March. She testifies to that at page 1657. But the only documentation we have from her is that she wasn't considering that, that she was considering something less than that, right? The documentation we have from her is the March 28th memoranda, and I believe the other one is 27th, even though it was in reference to the March 26th event. And it said at the time of the first day's violations on March 26th, she was considering an improvement plan. But that's not inconsistent with her then testifying that she continued to have discussions about putting him on an improvement plan. And Ms. White... And what's the point of doing all this in secret? I'm afraid in secret in the sense that, that Mr. Osorio... Was not informed that this was all going on. Well, the decision hadn't been made on what to do. And I wouldn't say it was a secret that he was, his performance and his conduct was under review. He was pulled from his screening duties because it was determined that he was a danger to the traveling public to allow him to continue. Even though in April, he gets a three in terms of security risk. Even though in... Acceptable. The risk-based security. Yes, but as we've noted, he received unsatisfactory performance reviews for two of the areas. And it was clear he needed to review the SOPs and he was having problems with them. The problem that Petitioner's Counsel seems to have with, or the petitioner seems to have with the Mid-Year Review is that it wasn't robust enough or didn't mention this conduct. But it's important to note that the Mid-Year Review came before any disclosure. The SOP violations came before any disclosure. So Petitioner's Counsel's argument seems to be that the Mid-Year Review suggests that they no longer were going to discipline him or weren't going to discipline him for five... Suspend him for five days. And that's shown by the Mid-Year Review. So in other words, an employee can't rely on the fact that the Mid-Year Review goes through March 31st. Once it gets that on April 15th, he's got to assume that, oh, they may find something else. What if they found something from January? Would they have been allowed to discipline him from that on that? Well, Your Honor, I don't know about any statute. I think there actually are regulations. I think about how far back you can go in time. But Mr. Conduct was being looked into immediately. And they weren't going back too far in time when they were looking at it. And when they were doing the Mid-Year Review, although I know the suggestion is that they should have repeated the SOP violations and the fact that he was going to be suspended in the Mid-Year Review, that disciplinary process hadn't been completed up until that point. Did the Mid-Year Review take into account his performance on the Improvement Plan? Well, the Improvement Plan wasn't issued until June 19th. So under the Mid-Year Review, having received one, as Petitioner and Counsel noted, according to the TSA handbook, that means he was subject to get his performance up to a satisfactory level. But even before the Mid-Year Review, Mr. Ashcroft was discussing with others putting him on an Improvement Plan because of his history of SOP violations. When you say history, wasn't the Administrative Judge required to consider the many years that he was with TSA without any notice of violation? Well, Your Honor, the Administrative Judge did consider the full material before him in the fact-finding material, which starts at 1280, but in particular at 1292 of the appendix, it includes a history of SOP violations. Mr. Azari would have been aware of those in the proposed suspension and in the suspension itself. He worked at an airport for two years prior to transferring to this one, and those two years and this prior record doesn't indicate any poor performance type reviews or SOP violations. That's not before the court, and it is true that his conduct became particularly egregious in this time frame. I brought it up because you said that his record had been looked at, the history of his employment record had been looked at. Oh, Your Honor, I was referring there to the fact-finding material, how it gathered documents from prior SOP violations. So even though he hadn't been disciplined for those prior SOP violations, there had been documentation of prior violations. When did Ms. Ashcraft begin supervising Mr. Azari? Well, she testified that she was not his direct supervisor, but she witnessed that she was a supervisory transportation security officer, so she was supervising at the time of some of these SOP violations, and she witnessed some of them. I think that's one of the reasons that she took the lead in preparing the memoranda for Mr. Bezerra's, and she was the one that proposed the suspension on May 2nd. I think it's important to note that Ms. Ashcraft testified and the administrative judge credited having witnessed or testified that she had decided as of late March that she was going to propose suspension or other form of discipline, and she testifies to that effect the transcript in the appendix at page 1664. Of course, by that point, by the time she testifies, there's been a second whistleblower disclosure that identifies her personally as having engaged in her own SOP violations. By the time she testifies in front of the administrative judge. Yeah, and her testimony was inconsistent with the written documentation where she had said that she wasn't going to suspend. Well, I don't think it actually, the documentation discussed whether she was going to suspend or what she was going to do after she learned on March 28th that he had committed a third violation after she discovered that he had three violations on March 25th, so I don't think that her testimony is inconsistent. The administrative judge didn't find it inconsistent, and the question with the suspension and if the improvement plan notices whether there was retaliation for the April 30th disclosure, and your honor, as petitioner's counsel, it doesn't really say much there, and that's kind of the sense one has in reading it. It really is just complaining about his duties that he had been assigned. They were non-security duties, and he was complaining that he was unable to perform them, so there wasn't really much motivation just even on the face of the document that someone would have to suspend Mr. Esrari and put him on an improvement plan notice. And to the contrary of having any ill will, Ms. Ashcroft actually encouraged Mr. Esrari to document his concerns. It says that on the face of the disclosure at 247 of the appendix. What are we to make of the fact that after his second disclosure there was a review, and it was determined that many people were violating various SLPs? I don't, I don't think that, I don't think the record supports that that the conclusion that the administrative inquiry conducted as a result of the disclosure found that many people were violating the SLP. Well, they took corrective action. And as to the agency's credit, they took these allegations seriously. But that by taking corrective action, I think that that that shows that some of the other employees were in fact engaging in these SLP violations. I don't think the record supports and petitioner hasn't pointed to which SLPs were being violated. The policy change was about eating food and cell phone use. That's what he reported. That's what he reported, but that's not per se. Are you telling me there's no SLP that says when someone's supposed to be analyzing whether there's a security risk in a security line at the airport, that it's okay for them to be chatting on their cell phone with their friends? I don't think that's, I doubt that there's not an SLP covering that. Maybe with that, that exact fact pattern that if they're supposed to be doing something, they're supposed to be looking at a screen and they're on the phone. I would, I would suspect you're right. I think the disclosure though that Mr. Esrari made generally concerned doing non-work activities on work hours, but the administrative inquiry did not, did not. Although they weren't as benign as that. I mean some of these activities went to security risk, like ordering pizza and having it delivered right there at the, at the gate. That was one of the allegations. That's a security risk. In TSA, the airport changed the policy of... So the employees that were engaged in that activity, let's say the pizza activity, those pizza viewing videos in the back room and, and there was another one, but were the employees that were involved in those, were they given any type of performance reviews? Were they suspended or removed? I don't think the record speaks to that, but to the broader point of whether a TSA takes SLP violations seriously in disciplines, there is testimony to that effect with Mr. Brine, who's the highest official that testified in front of the administrative judge. He was assistant federal security director and starting that page in 1961 discusses... Well after, after he made this valuable disclosure, which you, you're telling us now is a, is not only a legitimate but, but beneficial disclosure, he was suspended and removed. Well he was, that's the one disclosure that comes, that disclosure came after the, the first two personnel, personnel actions at issue, the IPN in June and the, and the... But it's, but it's still relevant because the question is, is not just whether there was an action taken in response to a particular disclosure, but whether he would have been terminated or suspended otherwise. And if other people are allowed to get away with SLP violations without being terminated or suspended or placed on, on performance reviews, then that's indicative of whether or not, but for these violations, he would have suffered these, these additional consequences. Your Honor, I don't think that the record supports the conclusion that other people were allowed to get away with SLP violations. I, I think Mr. Crosby was someone that Mr. Esrauri called. He had been suspended for violating a single SLP. Mr. Esrauri was someone in the league of his own in the number of SLP violations. And as I mentioned, Mr. Bryant testified to having, having been aware of or involved in discipline for other SLP violations. And it's important to remember that Mr. Esrauri was not removed for violating a single SLP or for those three. Mr. Esrauri was removed because his performance had fallen below an unsatisfactory level over, over multiple areas of his performance. So, so when he was removed, he was removed because he was unable to bring his performance up to a satisfactory level. Ms. Whitehead, who proposed the suspension, testified he was removed for that reason. Page 1776 of the appendix, Mr. Bryant, who decided the removal, testified that he was in the documents before the administrative judge, including the improvement plan notes, show that Mr. Esrauri was failing his improvement plan. He wasn't really making much of an effort even to complete it well. So he wasn't removed because of an SLP violation. He was removed because he had a history of performing badly. And he was, the agency had concluded that it was a danger to have him continue as a Transition Security Officer. Okay, your time's up. Thank you. Just briefly, the government brought up Ms. Whitehead's testimony. Ms. Whitehead testified that they did not begin preparing Mr. Esrauri's IPN until after she started in April. So at some after April 22nd, which is the day she started. And that IPN basically becomes a do-over of Mr. Esrauri's mid-year review evaluation, where they're going back and looking at things and now changing him. And so looking at the board's decision, that was the sort of thing, that was the sort of change in contradictory evidence that underwent more very much should have been addressed and at least explained how he got past it. So you're arguing well, I think, about that there's coincidence that you got these different stages that have come together and by that we should infer something in favor of your client. But what is the evidentiary nexus between those three events? The, I'm sorry, which three events? Well, the ones you're talking about, the mid-term and the poor performance reviews. What's the nexus between those? I think our argument is that it's missing and so because the government has a burden here. What's, what's missing? The nexus, the connection to say that, you know, there was poor performance in March and we had. So can we say that there is no nexus and that's why it's not mentioned? No, I don't think that's how I would say it. I would, I think the argument is that we have this evaluation. It could possibly be the basis of a performance review plan, but there's no evidence suggesting that it actually was the basis and the government's burden and what the board was supposed to find was that, in fact, it was the basis of the performance review plan or there was some other basis, but that's not what's in the record. So the missing piece is the link. What triggered this performance review plan? Because we know once he gets into the performance review plan, we're very much in a world. Are we required under our case law to assume, to presume that that evidence was reviewed? You assume that the court reviewed all the evidence, the court below. However, this court had said in Whitmore that any determination by an A.J. that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or conclusions is unreasonable and not supported by substantial evidence. The court goes on in an earlier passage to talk about you have to actually address it. That's what allows this court to perform. What about Lowder versus Department of Homeland Security? We said the agency has broad discretion to determine what the opinion should contain and in what detail. That's fair, but I do think that it would be contradictory to the the court's determination that where you have clear countervailing evidence, it needs to be addressed. And so in this case... But that's not our standard review, is it? I mean, your friend on the other side has pointed to, I mean, clearly you want to point out inconsistencies and holes, but there's testimony, there's documentary evidence for all of these decisions that the A.J. believed was sufficient to show, to meet the government's fair and convincing burden. You tell a different story that the A.J. certainly could have believed, but didn't. It found more credible the government's account that he was performing badly, which is why he was suspended. He got a poor performance review, which was why he got the performance improvement plan, and he failed his performance improvement plan, which was why he was removed. There's testimony and documentary evidence for all of that, isn't there? And isn't that all we need to... In fact, aren't we required to affirm based on that? I know by taking over, you can answer. Thank you. I don't agree with that, and I don't agree with that because the issues that we're raising here are legal errors, legal errors that undermine... Let's just assume. I get you're trying to manufacture a legal error here, but to me it seems I don't see any legal error. I think the board looked at all of this and made the decision that the government approved its burden by clear and convincing evidence based upon this, and if that's the case, isn't there substantial evidence for all of those conclusions? If you accept that the board considered all the evidence and can explain away the discrepancies in the record, then potentially, but I think you still have the additional legal error that their findings were not that they would have taken this but rather they could have. So I think you still have the second legal error. Thank you. Time's up. Thank you.